UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| GEORGE B.,<br><br>     Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,<br><br>     Defendant. | **REPORT AND RECOMMENDATION TO AFFIRM THE COMMISSIONER'S DECISION DENYING DISABILITY BENEFITS**<br><br>Case No. 2:21-cv-00295<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff George B.[1] brought this action against Defendant Kilolo Kijakazi, Acting Commissioner of the Social Security Administration (the "Commissioner"), seeking judicial review of the denial of his application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1385. (*See* Compl., Doc. No. 3.)  The Administrative Law Judge ("ALJ") determined Mr. B. did not qualify as disabled.  (Certified Tr. of Admin. R. ("Tr.") 865–78, Doc. No. 15.)  After careful review of the entire record and the parties' briefs,[2] the undersigned[3] recommends the district judge affirm the Commissioner's decision.

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in certain cases, including Social Security cases, the court refers to Plaintiff by his first name and last initial only.

[2] This recommendation is based on the written memoranda, as oral argument is unnecessary.  *See* DUCivR 7-1(g).

[3] On June 22, 2021, District Judge Parrish referred this case to the undersigned magistrate judge under 28 U.S.C. § 636(b)(1)(B).  (Doc. No. 10.)

STANDARD OF REVIEW

Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code provide for judicial review of a final decision of the Commissioner of the Social Security Administration. This court reviews the ALJ's decision to determine whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principals have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

An ALJ's factual findings are "conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153, ___ U.S. ___ (2019) (internal quotation marks omitted). Although the evidentiary sufficiency threshold for substantial evidence is "not high," it is "more than a mere scintilla." *Id.* at 1154 (internal quotation marks omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (internal quotation marks omitted). And the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

APPLICABLE LAW

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also id.* § 1382c(a)(3)(A). An

2

individual is considered disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A); *see also id.* § 1382c(a)(3)(B).

In making a disability determination, the ALJ employs a five-step sequential evaluation, considering whether:

1) The claimant is engaged in substantial gainful activity;

2) The claimant has a severe, medically determinable physical or mental impairment;

3) The impairment is equivalent to an impairment listed in the appendix of the relevant disability regulation, which precludes substantial gainful activity;

4) The claimant has a residual functional capacity to perform past, relevant work; and

5) The claimant has a residual functional capacity to perform other work in the national economy considering his/her/their age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988).  The claimant has the burden of establishing the disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy.  *Id.*

<u>PROCEDURAL HISTORY</u>

Mr. B. applied for Title II disability benefits on January 27, 2016, (Tr. 237), and Title XVI benefits on February 1, 2016, (*id.* at 239).  Mr. B. alleged disability beginning on March 18, 2010.  (*Id.* at 237, 239.)  After a hearing, the ALJ issued a decision in October 2018, finding Mr. B. was not disabled.  (*Id.* at 10–23.)  The Appeals Council denied Mr. B.'s request for review,

3

(*id.* at 1–3), and he appealed to the district court.  In April 2020, the district court remanded the case for further administrative proceedings based on the Commissioner's unopposed motion for remand.  (*Id.* at 949–50.)  The Appeals Council issued an order in May 2020, vacating the October 2018 decision and remanding the case to the ALJ for a new hearing.  (*Id.* at 956–58.)  The Appeals Council directed the ALJ to further evaluate Mr. B.'s mental impairments and RFC, "[c]onsider the need to obtain evidence from a medical expert . . . related to the nature and severity of and functional limitations resulting from the claimant's impairments," and obtain supplemental vocational expert testimony if warranted by the expanded record.  (*Id.* at 958.)

The ALJ held a second hearing in October 2020.  (*Id.* at 886–921.)  In December 2020, the ALJ issued a new decision finding Mr. B. was not disabled.  (*Id.* at 865–78.)  At step two of the sequential evaluation, the ALJ found Mr. B. had the severe impairments of "bilateral degenerative joint disease of the hips status post total hip arthroplasty and degenerative disc disease of the lumbar spine."  (*Id.* at 868.)  The ALJ found Mr. B.'s mental impairments of depression and anxiety did "not cause more than minimal limitation in the claimant's ability to perform basic mental work activities" and were, therefore, nonsevere.  (*Id.*)  At step three, the ALJ found Mr. B.'s impairments did not meet or equal the severity of an impairment listing.  (*Id.* at 870–71.)  At step four, the ALJ determined Mr. B. had the RFC to perform "light work" as follows:

> He can lift or carry up to 20 pounds occasionally and up to 10 pounds frequently. He can stand or walk up to two hours in an eight-hour workday (with normal breaks) and can sit up to six hours in an eight-hour workday (with normal breaks). He can occasionally push and pull foot controls with his bilateral lower extremities. He can occasionally climb ramps or stairs and can never climb ladders, ropes, or scaffolds.  He can occasionally balance, stoop, kneel, crouch, and crawl.  He can never be exposed to hazards such as unrestricted heights and dangerous moving machinery.  He can occasionally be exposed to extreme cold, extreme heat, and vibration.  Due to physical pain, he can perform goal-oriented but not assembly line paced work.

(*Id.* at 871–72.)  The ALJ did not include limitations related to mental impairments in the RFC. (*See id.*)  Based on this RFC, the ALJ found Mr. B. was unable to perform any past relevant work.  (*Id.* at 876.)  However, the ALJ found Mr. B. was not disabled because, at step five, he found Mr. B. capable of performing other jobs existing in significant numbers in the national economy.  (*Id.* at 877.)  The Appeals Council denied Mr. B.'s request for review, (*id.* at 855–58), making the ALJ's decision final for purposes of judicial review.

## DISCUSSION

Mr. B. raises three claims of error.  First, he argues the ALJ failed to adequately consider his mental impairments in assessing his RFC.  (Opening Br. 16–17, Doc. No. 20.)  Second, he argues the ALJ failed to properly evaluate the medical opinion evidence of his treating physician, Dr. Jaffe.  (*Id.* at 17–23.)  Finally, Mr. B. argues the ALJ failed to comply with the Appeals Council's remand order to consider the need to obtain evidence from a medical expert.  (*Id.* at 23–24.)

### A.  Mental Impairments

Mr. B. first argues the ALJ failed to consider the limiting effects of his nonsevere mental impairments in determining his RFC.  (Opening Br. 16, Doc. No. 20.)  Specifically, Mr. B. contends the ALJ failed to mention work-related mental limitations or discuss evidence supporting such limitations in the portion of the decision addressing the RFC.  (*Id.* at 17.)

"In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  Soc. Sec. Ruling ("SSR") 96-8p, 1996 SSR LEXIS 5, at *14.  Thus, "even if the ALJ determines that a claimant's medically determinable mental impairments are 'not severe,' he must further consider and discuss them as part of his residual functional capacity (RFC) analysis at step four."  *Wells v.*

5

*Colvin*, 727 F.3d 1061, 1064 (10th Cir. 2013).  The ALJ may not simply rely on findings at steps two and three of the of the sequential analysis as a substitute for a proper RFC analysis.  *See id.* at 1065; *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *13 (noting the "paragraph B" and "paragraph C" criteria used at steps two and three of the analysis to evaluate mental impairments are "not an RFC assessment," and that "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C").

The ALJ found Mr. B.'s mental impairments of anxiety and depression were medically determinable but nonsevere at step two of the sequential analysis.  (Tr. 868.)  In making this determination, the ALJ found Mr. B. had mild limitations in the four broad areas of mental functioning known as the "paragraph B" criteria: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (*Id.* at 869–70.)  The ALJ acknowledged the paragraph B criteria were not an RFC assessment but stated his RFC assessment reflected the degree of limitation he found in the paragraph B mental function analysis.  (*Id.* at 870.)  In the portion of the decision addressing the RFC, the ALJ discussed medical opinion evidence regarding Mr. B.'s mental impairments and found the record demonstrated no significant decrease in functioning as a result of these impairments.  (*Id.* at 874.)  The ALJ did not include any limitations related to mental impairments in Mr. B.'s RFC.  (*Id.* at 871–72.)

The ALJ adequately considered Mr. B.'s mental impairments in determining the RFC, and the ALJ's decision not to include limitations related to mental impairments is supported by substantial evidence.  In his RFC analysis, the ALJ addressed medical opinions regarding Mr. B.'s mental impairments from two state psychological consultants: Dr. Helmer and Dr.

MacNamara.  (*Id.* at 874.)  The ALJ's discussion of these opinions and his citations to the record evidence demonstrates he adequately considered the effect of Mr. B.'s mental impairments on Mr. B.'s RFC.

Dr. Helmer opined Mr. B. had mild limitations in three of the four areas of mental functioning (the "paragraph B" criteria), and no limitation in the remaining area.[4]  (*Id.* at 83–84, 101–02.)  The ALJ gave Dr. Helmer's opinion significant weight because it was "supported by the evidence reviewed by the consultant, which show[ed] no significant limitations from mental impairments," and was "consistent with the evidence of record, which demonstrates no significant decrease in functioning."  (*Id.* at 874.)  The ALJ cited two psychological consultative examinations from 2012 and 2016, (*id.* at 424–32, 760–66); records from Mr. B.'s treating physician, (*id.* at 520–613, 693, 773); and other medical records, (*id.* at 438–519, 614–675, 1113–1243), in support of his finding.

Dr. MacNamara opined Mr. B. had moderate limitations in the areas of social functioning and maintaining concentration, persistence, or pace, and mild or no limitations for the other two "paragraph B" criteria.  (*Id.* at 123–24, 146–47.)  She opined Mr. B.'s mental impairments were nonsevere.  (*Id.*)  Dr. MacNamara also offered opinions regarding Mr. B.'s mental RFC, finding he was moderately limited in the following areas: the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to interact with the general public, the ability to respond appropriately to changes in work settings, the ability to complete a normal workday and workweek without interruptions from psychologically based

---

[4] Both consultants' assessments refer to a prior version of the four paragraph B categories: activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration.  (Tr. 83, 101, 123–24, 146–47.)

symptoms, and the ability to perform at a consistent pace without an unreasonable number or length of rest periods.  (*Id.* at 128–31, 151–54.)  She opined Mr. B.'s mental RFC "would be consistent with low stress environments with low public contact."  (*Id.* at 131, 154.)

The ALJ stated he considered Dr. MacNamara's opinions and gave them partial weight. (*Id.* at 874.)  The ALJ found Dr. MacNamara's opinion regarding moderate limitations to be internally inconsistent with her opinion regarding lack of a severe impairment, and unsupported by the evidence she reviewed.  (*Id.*)  On the other hand, the ALJ found Dr. MacNamara's opinion that Mr. B.'s mental impairments were nonsevere to be "consistent with and supported by the records in the file, which demonstrate no significant decrease in functioning from mental impairments."  (*Id.*)  The ALJ cited the same records as in his analysis of Dr. Helmer's opinion. (*Id.*)  Finally, the ALJ noted the overall record supported limiting Mr. B. to goal-oriented but not assembly line paced work due to physical pain symptoms (not due to any mental impairment). (*Id.*)

The ALJ's discussion of the psychological consultants' opinions demonstrates he considered Mr. B.'s mental impairments in assessing Mr. B.'s RFC and found the record evidence did not support the inclusion of work limitations related to these impairments. Substantial evidence supports this finding, including the following records cited by the ALJ:

- 2012 and 2016 reports from psychological consultative examiner Dr. Barnett.  (*Id.* at 424–32, 760–66.)  Dr. Barnett observed in 2012 that Mr. B's interpersonal behavior was appropriate, he was able to manage stress, he was able to concentrate and keep pace throughout the evaluation, he was able to follow complex verbal directions, and testing results indicated his memory and cognitive functioning were normal.  (*Id.* at 427–28, 431.)  Dr. Barnett observed in 2018 that

> Mr. B.'s interpersonal functioning appeared normal, his concentration was normal, he was able to keep pace and follow instructions, and he was capable of managing personal finances.  (*Id.* at 763, 765.)
>
> - A 2012 assessment from Mr. B.'s treating physician, Dr. Jaffe, noting mild depression and anxiety but not listing any related restrictions or limitations.  (*Id.* at 623–25.)
> - A 2015 treatment note from Dr. Jaffe indicating Mr. B.'s anxiety and depression were improved with medication.  (*Id.* at 693.)
> - 2018 and 2020 treatment notes from Dr. Jaffe noting Mr. B.'s anxiety and depression were mild.  (*Id.* at 773, 1116.)

This evidence is more than a scintilla and is sufficient to support the ALJ's decision not to include limitations related to mental impairments in Mr. B.'s RFC.

Notably, Mr. B. fails to identify other evidence in the record supporting specific functional limitations related to mental impairments.  *Cf. McAnally v. Astrue*, 241 F. App'x 515, 518 (10th Cir. 2007) (unpublished) (upholding RFC assessment where the claimant did not identify additional limitations which should have been included, supported by the record).  Mr. B. also does not challenge the ALJ's analysis of the consultants' opinions or the weight the ALJ assigned to them.  The ALJ found Dr. MacNamara's opinion regarding moderate limitations was unsupported and inconsistent with the other record evidence, which is a proper basis to discount medical opinion evidence.  *See* 20 C.F.R. § 404.1527(c).  And, as discussed above, he gave Dr. Helmer's opinion significant weight.

Where substantial evidence supports the ALJ's decision not to include limitations related to mental impairments in Mr. B.'s RFC, the ALJ did not err.

9

### B.  Treating Physician's Opinions

Mr. B. next argues the ALJ failed to assign proper weight to opinion evidence from his treating physician, Dr. Jaffe.  (Opening Br. 17–23, Doc. No. 20.)

Because Mr. B.'s claim was filed before March 27, 2017, the regulations in 20 C.F.R. § 404.1527 govern the ALJ's consideration of medical opinion evidence.[5]  Under this framework, the ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight [the ALJ] assigns to such opinions."  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012); *see also* 20 C.F.R. § 404.1527(c) (requiring the ALJ to evaluate every medical opinion and listing the factors to be considered in assigning weight to a medical opinion).  The ALJ must give a treating physician's medical opinion "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  This analysis is sequential, meaning "if the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  *Watkins*, 350 F.3d at 1300.  While an express finding with respect to this first question was once considered mandatory, the Tenth Circuit has since declined to remand where it could determine from the ALJ's decision that it "implicitly declined to give the opinion controlling weight."  *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014).

If the ALJ does not give a treating source opinion controlling weight, the ALJ must consider the level of deference to give it, using the factors in 20 C.F.R. § 404.1527(c).  These factors include:

---

[5] The Social Security Administration revised its rules regarding the evaluation of treating physician opinions for claims filed on or after March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01 at *5844–45.

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1301 (internal quotation marks omitted). The ALJ need not "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). But the ALJ must "give good reasons in the notice of determination or opinion for the weight that is given the treating physician's opinion." *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527(c)(2). The court may not supply possible reasons for giving less weight to or rejecting the treating physician's opinion but may only evaluate the ALJ's decision on its stated reasons. *Robinson v. Barnhart*, 366 F.3d 1078, 1084–85 (10th Cir. 2004).

The ALJ considered several opinions from Dr. Jaffe, giving them all little weight. (Tr. 874–75.) First, the ALJ found Dr. Jaffe's opinions that Mr. B. was disabled, unable to work, and "appropriate for SSDI" addressed a legal conclusion reserved to the Commissioner. (*Id.* at 874.) Next, the ALJ considered Dr. Jaffe's opinions from 2012, 2018, and 2020 regarding specific functional limitations. (*Id.* at 875.) The ALJ found these opinions unsupported by reference to clinical signs or treatment notes and inconsistent with other evidence in the record. (*Id.*)

Mr. B. contends the ALJ failed to acknowledge Dr. Jaffe was a treating physician and failed to give his opinions proper deference. (Opening Br. 19, Doc. No. 20.) But the ALJ's analysis demonstrates he applied the proper legal framework to Dr. Jaffe's opinions. The ALJ summarized Dr. Jaffe's treatment records earlier in the decision; thus, he was aware Dr. Jaffe

was a treating source.  (Tr. 872–73.)  The ALJ explained Dr. Jaffe's opinions were unsupported by clinical signs or treatment notes and were inconsistent with other medical evidence in the record.  (*Id.* at 875.)  The ALJ's stated decision to assign little weight to Dr. Jaffe's opinions on this basis shows the ALJ implicitly declined to give them controlling weight.

Mr. B. also argues the ALJ's reasons for rejecting Dr. Jaffe's June 2018 and August 2020 opinions were faulty.  As explained below, although some of Mr. B.'s critiques have merit, the ALJ offered several legitimate reasons, supported by the record, for discounting each opinion. Therefore, the ALJ's treatment of Dr. Jaffe's opinions is supported by substantial evidence.

### 1.  Dr. Jaffe's June 2018 Opinion

The ALJ considered Dr. Jaffe's June 2018 medical source statement opining Mr. B. was limited to light exertional activity with additional restrictions, he would miss more than three days of work each month, and he would have occasional concentration limitations due to pain. (Tr. 875 (citing *id.* at 843–46).)  The ALJ gave this opinion little weight because it "consist[ed] mostly of checked boxes without reference to clinical signs or treatment notes"; "it appear[ed] to be based on the claimant's subjective reports rather than [] medical examination or laboratory findings"; "[i]maging indicates only minor degenerative changes"; and it was "inconsistent with [Mr. B.'s] own reports that he did not need hip replacements or provider notes that he was trying to delay them."  (*Id.* at 875.)

First, Mr. B. challenges the ALJ's statement that Dr. Jaffe's 2018 opinion "appear[ed] to be based upon the claimant's subjective reports rather than [] medical examination or laboratory findings."  (Opening Br. 19, Doc. No. 20 (citing Tr. 875).)  As Mr. B. notes, Dr. Jaffe indicated on the form that Mr. B.'s symptoms were supported by MRIs and x-rays and noted "obvious

deformity on imaging." (Tr. 843, 846.) Thus, the ALJ's statement that Dr. Jaffe's opinion was based solely on subjective reports is inaccurate.

Second, Mr. B. challenges the ALJ's statement that Dr. Jaffe's opinion was "inconsistent with the minimal degenerative changes observed in the claimant's imaging." (Opening Br. 19, Doc. No. 20 (citing Tr. 875).) In support of this statement, the ALJ cited records from imaging in March 2011, October 2011, January 2012, and February 2018.[6] The ALJ's statement is largely supported by the imaging records from 2011 to 2013, which note minimal changes from prior imaging. (*See* Tr. 361–63; 474, 488, 500, 659–63.) But the February 2018 imaging report noted "severe degenerative changes of the left hip with irregularity of the articular surface of the left femoral head and changes suggesting avascular necrosis." (*Id.* at 776.) This report was made only four months before Dr. Jaffe's June 2018 opinion, which Dr. Jaffe indicated was based on "obvious deformity on imaging." (*Id.* at 846.) The ALJ does not explain how this

---

[6] Specifically, the ALJ cited the following records:
- March 2011 x-rays and CT scans indicating "no fracture-dislocation" of the pelvis and no "osseous injury" to the cervical spine, thoracic spine, and skull, and indicating "pelvic structures are within normal limits." (Tr. 341, 343–46, 377–80, 398–400.) The imaging was taken after Mr. B. was assaulted with a baseball bat. (*Id.* at 343.)
- October 2011 MRI of the pelvis. (*Id.* at 361–62.) The report states "[t]he findings are suggestive of large areas of osteonecrosis." (*Id.* at 361.)
- October 2011 MRI of the lumbar spine indicating "[r]ather mild disc related degenerative changes within the lower lumbar spine without significant canal stenosis." (*Id.* at 363, 529 (duplicate record).)
- January 2012 pelvis imaging report finding "[n]o significant change [in] the appearance of a likely cystic structure within the right femoral neck," and no significant change in appearance from prior MRI in areas of avascular necrosis. (*Id.* at 659–63.)
- Treatment notes from Dr. Jaffe noting the October 2011 hip MRI showed "bilateral osteonecrosis and proximal intertrochanteric abnormality"; a January 2012 x-ray was "unchanged from initial with bone island and flattened medial femoral head"; and a December 2013 x-ray of femur and tibia showed "cysts in femoral head . . . unchanged." (*Id.* at 474, 488, 500; see also id. at 700, 708, 716 (duplicate records).)
- February 2018 imaging report finding "severe degenerative changes of the left hip with irregularity of the articular surface of the left femoral head and changes suggesting avascular necrosis." (*Id.* at 776.)

imaging was inconsistent with Dr. Jaffe's opinion, and it contradicts the ALJ's statement that only mild degenerative changes were observed.

Nevertheless, the ALJ supplied other reasons for discounting Dr. Jaffe's 2018 opinion which are supported by the record.  The ALJ correctly noted the form consists mostly of checked boxes without reference to clinical signs or treatment notes.  (*Id.* at 875.)  Although the form references MRIs and x-rays, it contains no narrative explanation of how this imaging supports Dr. Jaffe's opinion regarding specific limitations.  (*Id.* at 843–46.)  And the form does not refer to testing or treatment notes supporting the specific limitations suggested.  (*Id.*)  Further, the ALJ found Dr. Jaffe's 2018 opinion inconsistent with Mr. B.'s own statements that he did not need a hip replacement, and with evidence that Mr. B. sought to delay a hip replacement.  (*Id.* at 875.)  This finding is supported by the record, including Dr. Jaffe's 2015 note that Mr. B. was trying to delay a recommended hip replacement, (*id.* at 527); Mr. B.'s July 2018 testimony that he was not interested in proceeding with hip replacements recommended by his doctors, (*id.* at 57); and Mr. B.'s October 2020 testimony that a right hip replacement was "not necessary" despite his doctor's recommendation and his successful left hip replacement earlier that year, (*id.* at 898). The ALJ could properly conclude Mr. B.'s decision to delay or decline recommended treatment indicated he was not as limited as Dr. Jaffe opined.  *Cf.* 20 C.F.R. § 416.930(b) (providing a claimant's refusal to follow prescribed medical treatment without good reason will preclude a finding of disability).  Thus, the ALJ stated valid reasons for finding Dr. Jaffe's opinion unsupported and inconsistent with other evidence in the record.

Where the ALJ offered legitimate reasons for the weight assigned to Dr. Jaffe's opinion, the court will not reweigh the evidence.  The ALJ did not err in discounting Dr. Jaffe's June 2018 opinion.

### 2. Dr. Jaffe's August 2020 Opinion

The ALJ considered Dr. Jaffe's August 2020 opinion that Mr. B. was limited to sedentary activities and must limit postural activities and restrict environmental conditions. (Tr. 875 (citing *id.* at 1110–12).) The ALJ gave this opinion little weight because it "consist[ed] mostly of checked boxes without reference to supporting clinical signs or treatment notes"; it did not mention Mr. B.'s recent, successful left hip replacement; and it was inconsistent with contemporaneous records indicating no postoperative complications from the left hip replacement. (*Id.*) The ALJ also found this opinion inconsistent with Dr. Jaffe's prior opinions (from before the left hip replacement) that Mr. B. was capable of light lifting. (*Id.*) Finally, the ALJ noted Dr. Jaffe opined that Mr. B. needed temperature restrictions since 2008, despite having opined in 2018 that no temperature restrictions applied. (*Id.*)

Mr. B. argues Dr. Jaffe's August 2020 opinion was supported by clinical signs, including references to imaging, objective signs like "painful hip range of motion," and narrative statements explaining the nature of Mr. B.'s condition. (Opening Br. 22, Doc. No. 20 (citing Tr. 1110-12).) But even assuming this portion of the ALJ's stated reasoning was inaccurate, the ALJ offered other, valid reasons for discounting Dr. Jaffe's August 2020 opinion. The ALJ could properly conclude Dr. Jaffe's opinion was unsupported where Dr. Jaffe failed to mention Mr. B.'s left hip replacement or explain why Mr. B. had greater limitations after this procedure than he did two years earlier, despite records indicating the procedure was successful. (*See* Tr. 1114, 1196.) Indeed, Dr. Jaffe's own treatment notes from August 2020 indicate Mr. B.'s "[l]eft hip is so much better than before" and "doing very well." (*Id.* at 1114.) Given this assessment, Dr. Jaffe's failure to mention the left hip replacement or to explain why Mr. B. was more limited than before the procedure were valid reasons for the ALJ to discount the opinion. And the

15

unexplained discrepancy between Dr. Jaffe's 2018 and 2020 opinions regarding temperature restrictions provides further support for the ALJ's decision to discount the opinion.  (Tr. 844, 1111–12.)   Thus, the ALJ offered legitimate reasons supported by the record for the weight assigned to Dr. Jaffe's 2020 opinion.

For these reasons, the ALJ did not err in his analysis of Dr. Jaffe's opinions.

### C.  Appeals Council's Order

Finally, Mr. B. argues the ALJ failed to follow the Appeals Council's remand order to consider the need to obtain evidence from a medical expert regarding Mr. B.'s functional limitations.  (Opening Br. 23–24, Doc. No. 20.)

An ALJ "shall take any action that is ordered by the Appeals Council and may take any action that is not inconsistent with the Appeals Council's remand order."  20 C.F.R. §§ 404.977(b), 416.1477(b).  Thus, "[w]hen the Appeals Council remands a case with instructions, those instructions become legal requirements with which the ALJ is bound to comply."  *Noreja v. Comm'r, Soc. Sec. Admin.*, 952 F.3d 1172, 1179 (10th Cir. 2020).  In reviewing the Commissioner's final decision, the court may "consider whether the ALJ complied with any legal requirements imposed by the Appeals Council upon remand."  *Id.* at 1180.  An ALJ's failure to follow an Appeals Council's directive "may or may not render the ALJ's decision legally or factually insupportable under 42 U.S.C. § 405(g)."  *Id.* at 1178.

Here, the Appeals Council directed the ALJ to "[c]onsider the need to obtain evidence from a medical expert (ME) related to the nature and severity of and functional limitations resulting from the claimant's impairments," citing 20 C.F.R. § 404.1513a(b)(2) and 20 C.F.R.

§ 416.913a(b)(2). (Tr. 958.) The ALJ quoted this directive at the beginning of his decision, (*id.* at 865), but he did not otherwise address it, and he did not obtain any new medical expert evidence.

The ALJ's express acknowledgement of the Appeals Council's directive is sufficient to show he considered the matter, which is all the Appeals Council's order required. Generally, an ALJ's statement that he has considered a matter is accepted on its face. *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007). And the Appeals Council did not direct the ALJ to actually obtain medical expert evidence—only to consider whether to do so. Mr. B. has not cited any authority requiring the ALJ to explain the nature or extent of his consideration.

Even if the ALJ had failed to comply with the Appeals Council's directive, Mr. B. has not shown such failure rendered the ALJ's decision legally or factually insupportable. The regulations cited by the Appeals Council merely state that, in addition to considering prior administrative medical findings from agency medical consultants, ALJs "may also ask for medical evidence from expert medical sources." 20 C.F.R. § 404.1513a(b)(2); 20 C.F.R. § 416.913a(b)(2). In this case, the ALJ relied on medical opinion evidence already in the record concerning the nature and severity of Mr. B.'s functional limitations, including that of two state agency medical consultants. (*See* Tr. 873–74 (discussing the opinions of Dr. Thobe and Dr. Barton and finding the evidence supportive of a light level of exertion with limitations in climbing and other postural activities).) And, as described above, the ALJ's decision to discount Dr. Jaffe's opinions assessing greater functional limitations was supported by substantial evidence in the record. Thus, the ALJ's assessment of Mr. B.'s functional limitations is supported by substantial evidence, including medical opinion evidence. The ALJ was not required to obtain additional medical expert evidence where the existing evidence was sufficient

to make informed findings.  Accordingly, any failure to consider the need for additional medical expert evidence did not render the ALJ's decision legally or factually insupportable.  *See Noreja*, 952 F.3d at 1178.

RECOMMENDATION

The undersigned RECOMMENDS the district judge AFFIRM the Commissioner's decision.  The court will send copies of this Report and Recommendation to all parties, who are notified of their right to object.  Any objection to this Report and Recommendation must be filed within fourteen days of service.  *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 72(b).  Failure to object may constitute waiver of objections upon subsequent review.

DATED this 4th day of August, 2022.

BY THE COURT:

Daphne A. Oberg
United States Magistrate Judge